# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

RALPH J. PENLEY and DONNA PENLEY
as Co-Personal Representatives of the Estate
of Christopher David Penley, Deceased; and
as natural parents of Christopher David
Penley ,

                      Plaintiffs,

-vs-                                                     Case No. 6:08-cv-310-Orl-31KRS

DONALD F. ESLINGER, individually and
as Sheriff of Seminole County and
MICHAEL W. WEIPPERT individually
and in his official capacity as a duly
appointed Deputy Sheriff of Seminole
County ,

                      Defendants.
_____

## ORDER

      This matter comes before the Court on the Motion for Summary Judgment (Doc. 35) filed by Defendant Michael Weippert ("Weippert"), the Motion for Summary Judgment (Doc. 36) filed by Defendant Donald F. Eslinger ("Eslinger"), the responses (Doc. 54, 55) filed by the Plaintiffs, Ralph and Donna Penley, and the replies (Doc. 65, 72) filed by the Defendants.

**I.    Background**

      On January 13, 2006, 15-year-old Christopher Penley (henceforth, "Penley") brought a gun to Milwee Middle School. According to statements from fellow students and his teacher, Penley showed the gun, tucked in his waistband, to several students before class. After class started, one of the students told the teacher, Gretchen Pletzer ("Pletzer"), that Penley was carrying a weapon.

Pletzer asked Penley whether he had a gun, and Penley said he did. Pletzer notified the office, which initiated a lockdown of the school. Penley got out of his seat, turned out the classroom lights and drew the weapon. In the ensuing panic, Pletzer and the students fled the room.[1] Penley then left the classroom and, according to witness reports, began moving around the campus, going through classrooms and up and down staircases.

At approximately 9:40 a.m., Deputy Teresa Maiorana of the Seminole County Sheriff's Office, responding to a radio call about a male armed with a handgun at the school, encountered Penley near the back of Building 7. (Doc. 38 at 24). Aiming her gun at Penley, she repeatedly yelled at him to drop his weapon. (Doc. 38 at 25). Penley, who had the gun pressed to his chin, did not do so. Instead, he said something along the lines of "I'm going to die one way or another," then ducked into a nearby bathroom. (Doc. 38 at 25-26).

The bathroom, which had no other entrances aside from the one Penley utilized, opened out onto a courtyard that was bordered by other school buildings and at least one portable classroom. (Doc. 38 at 56). At least some of the buildings around the courtyard still had students in them. (Doc. 42-3 at 65). As additional law enforcement officers responded to the radio call about the armed male at the school, they assembled at different points around the courtyard.

Deputy Chris Maiorano took up a position about 50 feet from entrance to the bathroom, near the corner of a building that provided him with partial cover while he kept watch on Penley's location. (Doc. 40 at 21, 102). Because he was at a slight angle to the entrance to the long,

---

[1] After drawing the weapon, Penley tried to force another student, Maurice Cotey ("Cotey"), to remain in the classroom, holding him at gunpoint. After a struggle, Cotey escaped, leaving Penley alone in the room.

rectangular bathroom – which contained a number of stalls and sinks – Chris Maiorano could see a portion but not all of its interior. (Doc. 40 at 21, 102). The entrance to the bathroom remained open the entire time that Penley was inside. As Chris Maiorano tried to communicate with Penley, he was able to see him walking back and forth from side to side in the restroom, a number of feet back from the entrance. (Doc. 40 at 24). Sometimes Penley had the weapon to his own chin; at other times he would point it in the general direction of Chris Maiorano. (Doc. 40 at 24). Chris Maiorano announced to the other officers that Penley was wielding a black semiautomatic pistol. (Doc. 40 at 99). At one point, when the deputy had holstered his weapon to try to convince Penley to drop his gun, Penley came into view and pointed his gun directly at him. (Doc. 40 at 24).[2] When Chris Maiorano made this announcement over the radio, Weippert moved across the courtyard to his position. (Doc. 42-3 at 13).

During this period, Sergeant Kevin Brubaker ("Brubaker") had taken up a position in the courtyard to the right of Chris Maiorano, approximately 20 feet from the bathroom's entrance. (Doc. 41 at 16, 55). Brubaker, a trained hostage negotiator (Doc. 41 at 6-7), attempted to convince Penley to drop the weapon and surrender. (Doc. 41 at 22). At first, Brubaker had no cover, but eventually another officer joined him with a ballistic shield, which they both utilized. (Doc. 41 at 20). Brubaker spent approximately 20 minutes attempting to negotiate with Penley, but other than telling Brubaker his first name, Penley would not speak to him or obey his commands to drop the gun. (Doc. 41 at 21-22). (Penley did follow some of Brubaker's directions, such as when

---

[2]Chris Maiorano testified that he made similar announcements several times during the incident, telling his fellow officers both over the radio and by voice alone that Penley "kept pointing the weapon at me." (Doc. 40 at 60).

Brubaker told him to move back into view. (Doc. 41 at 21).) Brubaker continued to attempt to negotiate with Penley throughout the incident. (Doc. 41 at 23).

Weippert, who had joined Chris Maiorano at his position about 50 feet from the bathroom entrance, was a member of the SWAT team (Doc. 42 at 45). That day, Weippert was armed with an AR-15 semi-automatic rifle with a three-power scope. (Doc. 42-2 at 47). From his position alongside Chris Maiorano, Weippert watched the entrance to the bathroom through the scope. (Doc. 42-3 at 50-51). According to Weippert's testimony, he saw Penley come into view three times, moving from one side of the doorway to the other while pointing his weapon at Weippert, then disappearing from Weippert's view. (Doc. 42-3 at 28).[3] After the third time this happened, Weippert decided to shoot Penley. (Doc. 42-3 at 48). The next time Penley came into Weippert's view, at approximately 10:20 a.m., Weippert fired a single shot, striking Penley in the head. (Doc. 42-3 at 52-53). Penley died two days later. (Doc. 37-78 at 1).

After Penley was shot, the officers discovered that his weapon was a plastic air pistol, incapable of firing real bullets. When purchased, the gun was clear with an orange interior. (Doc. 37-16 at 7). Some time before bringing it to school, Penley had spraypainted the gun to look like a real nine millimeter pistol. (Doc. 37-16 at 6). There is no evidence that prior to the shooting any of the police officers even suspected that Penley's gun was not real.[4]

---

[3]Chris Maiorano also testified that as Penley moved from side to side across the entrance to the bathroom, he would sometimes point his weapon "directly at us". (Doc. 40 at 39).

[4]When interviewed after the shooting, the student who struggled with Penley in his classroom, Cotey, stated that the gun had an orange tip, "felt plastic," and started to come apart during their struggle. (Doc. 37-7 at 8-9). However, there is no evidence that Cotey – who said that after the struggle he was still in fear that it was a real gun (Doc. 37-7 at 9) – passed this information to anyone before the shooting.

On January 11, 2008, the Plaintiffs filed the instant suit as personal representatives of Penley's estate, raising claims under the Fourth Amendment and Florida's wrongful death statute, Fla. Stat. § 768.16 *et seq.* The Defendants now seek summary judgment on both claims. They contend, *inter alia*, that Weippert is entitled to qualified immunity on the Fourth Amendment claim and that Weippert was privileged to use lethal force under the wrongful death statute.

## II. Legal Standards

**Summary Judgment**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

**Qualified Immunity**

Qualified immunity protects government officials performing discretionary functions from individual liability as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity is an immunity from suit rather than a mere defense to liability, and it is effectively lost if a case is erroneously permitted to go to trial. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). Qualified immunity decisions should be resolved at earliest possible stage in the litigation. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam*). Unless the plaintiff's allegations state a claim of violation of a clearly established constitutional right, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001). Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in question in fact committed those acts. *Mitchell*,

To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority. *Gonzalez v. Reno*, 325 F.2d 1228, 1234 (11th Cir. 2003). Once the defendants establish this, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate. *Id.* The Supreme Court has established a two-part test to determine whether qualified immunity should apply. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S.Ct. 2508, 2514, 153 L.Ed.2d 666 (2002). To resolve that inquiry, the Court must determine whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right. *Gonzalez*, 325 F.3d at 1234. If so, the Court must then determine whether the right was "clearly established." *Id.*

## III. Analysis

### A. Section 1983 claim against Weippert

There is no dispute as to whether Weippert was acting within his discretionary authority at the time he shot Penley. Thus the burden lies with the Plaintiffs to establish that Weippert is not entitled to qualified immunity in regard to the Section 1983 claim. And to establish that, the Plaintiffs must show that Weippert's actions violated Penley's constitutional rights.

A police officer's apprehension of a suspect by the use of deadly force is a "seizure" subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1698, 85 L.Ed.2d 1 (1985). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 105

L.Ed.2d 443 (1989). To determine the constitutionality of a seizure, the Court must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Id.* at 396, 109 S.Ct. at 1871. The intrusiveness of a seizure by means of deadly force is "unmatched," *Garner* at 9, 105 S.Ct. at 1700, justified only by the strongest governmental interests. However, where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to employ deadly force to accomplish the seizure. *Garner* at 11, 105 S.Ct. at 1701.

The Plaintiffs argue that, at the moment Weippert decided to pull the trigger, a reasonable officer in his position would not have thought that Penley posed a threat of serious physical harm. They assert that Penley was essentially contained in the bathroom, because it had no exit aside from the one that was covered by the weapons of at least half a dozen police officers, and because he made no effort to exit the bathroom during the approximately 40 minutes he was in there before he was shot. They argue that Weippert and the other officers surrounding the bathroom had "acceptable" cover, such as ballistic shields for Brubaker and others,[5] and the corner of a building for Weippert and Chris Maiorano. And they point out that Brubaker, who was closest to Penley during the standoff, testified that he did not feel threatened by Penley.

However, even when viewed in the light most favorable to the Plaintiffs, the evidence does not support these contentions, or the Plaintiffs' larger point. Although Penley was no longer running around the campus, he was not truly "contained," as he retained the ability to run out the

---

[5]The Plaintiffs also allege that, in addition to the wall that was partially shielding them, Weippert and Chris Maiorano had the benefit of ballistic shields. This issue is addressed below.

open door at any time with his gun, perhaps toward one of the still-occupied classrooms.[6]  More importantly, he did not need to leave the bathroom to pose a serious threat to others.

Even though the officers deemed their cover "acceptable," that cover did not eliminate the threat to their safety posed by Penley's (apparently real) firearm.  From within the restroom, Penley continued to threaten to shoot Chris Maiorano and Weippert, who only had the partial cover offered by a corner of a building.[7]  And ballistic shields do not necessarily offer perfect cover, particular when the officers employing them are moving around and when two officers are seeking shelter behind one shield, as was the case with Brubaker and the officer who brought him the shield.  Finally, a reasonable officer on the scene that day would have had to consider the possibility that one of the students in the buildings bordering the courtyard might choose the wrong moment to peer out a window.  (Doc. 42-3 at 45).

As for Brubaker, he was not in the same position as Weippert.  Because of their different viewpoints, Brubaker and Weippert saw Penley at different times.  According to his testimony, Brubaker did not see Penley repeatedly aiming his handgun at Chris Maiorano, Weippert, or anyone else.  As such, Brubaker's estimate of the danger posed by Penley would likely differ from that of an officer in Weippert's position,  And Brubaker obviously did believe that Penley posed

---

[6]The Plaintiffs point out that one of the portables bordering the courtyard was evacuated. (Doc. 55 at 12).  However, there is no evidence that *all* of the buildings around the courtyard were evacuated, much less all of the buildings in the school.  In addition, the evacuation of the one portable occurred during the standoff with Penley, and there is no evidence that Weippert was aware of the evacuation at the time it occurred.  A reasonable officer in Weippert's position would have thought at least some of the nearby buildings were still occupied.

[7]As noted above, there is no evidence that any of the officers knew that Penley's gun was not capable of firing real bullets.

some danger, as demonstrated by his taking cover behind a ballistic shield while attempting to negotiate.

The evidence shows that, at the time he decided to take the shot, Weippert had probable cause to believe that Penley had, among other things, threatened the lives of two police officers – himself and Chris Maiorano. Indeed, according to the officer's uncontradicted testimony, Penley was aiming his gun at Weippert at the moment Weippert fired. (Doc. 42-3 at 53). As such, it was not constitutionally unreasonable for Weippert to employ deadly force against him. The implicit threats made by Penley that day against his classmates and the other officers on the scene bolster this conclusion, but are not necessary for it.

Seeking to undermine Weippert's credibility, the Plaintiffs present the expert testimony of William Gaut ("Gaut"). Gaut, a police practices expert, reviewed a school videotape showing a portion of the courtyard during the events at issue in this suit. Toward the end of the standoff with Penley, two officers are seen crouching behind a ballistic shield and advancing from left to right across the courtyard, toward Penley's position in the bathroom. Gaut contends that one of these two officers is Weippert[8] and that the ballistic shield "negated any danger" from Penley, and that therefore there was no justification for Weippert to employ deadly force. (Doc. 57 at 2-3). However, neither Gaut nor the Plaintiffs present any evidence from which a reasonable juror could identify either of the officers behind the shield as Weippert. (Gaut is an expert in police practices, not videotape identification or anything of similar relevance to this issue.) For their part, the Defendants have produced affidavits from two other officers – David Dowda and Jarrit Negri –

---

[8]The Plaintiffs contend that the other officer behind the shield is Chris Maiorano, but Gaut does not make this contention in his affidavit.

attesting that they are the two individuals seen utilizing the ballistic shield and moving across the courtyard on the videotape. Based on this evidence, no reasonable jury could conclude that Weippert was one of the officers seen on the videotape advancing behind a ballistic shield.

The Plaintiffs also argue that Weippert's failure to warn Penley prior to employing deadly force against him fell short of the constitutional minimum. It is true that in *Garner*, the seminal case on the employment of deadly force, the Supreme Court imposed a requirement of a warning in some circumstances. More particularly in that case, in which the police shot an unarmed fleeing burglary suspect, the Court stated that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape *and if, where feasible, some warning has been given*." *Garner* at 11-12, 105 S.Ct. at 1701. However, the instant case did not involve a fleeing suspect. Rather, it involved a suspect who was pointing a gun at an officer at the moment he was shot. As such, the *Garner* warning requirement did not apply. In addition, by training their weapons on Penley, the officers implicitly warned him that he might be shot if he threatened them or failed to obey their commands. And the evidence shows that Penley understood this warning: When Teresa Maiorano pointed her weapon at him and ordered him to drop his gun, Penley responded to the effect that he was going to die one way or another.

Weippert did not violate Penley's constitutional rights when he employed deadly force against him. Weippert is therefore entitled to qualified immunity on the Plaintiffs' Section 1983 claim. Because there was no underlying constitutional violation, the Plaintiff's Section 1983 claim

against the Sheriff fails as a matter of law. *Rooney v. Watson*, 101 F.3d 1378, 1381-82 (11th Cir. 1996).

Turning to the state law claims, the Defendants contend that Weippert was privileged to use deadly force against Penley and therefore there was no violation of Florida's Wrongful Death Act, Fla. Stat. § 768.16 *et seq.* Florida Statute § 776.012(1) provides that a person "is justified in the use of deadly force and does not have a duty to retreat" if the person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another." Weippert's uncontradicted testimony would support such a conclusion. The Plaintiffs argue that there is "disputed evidence as to whether [Weippert] was acting in bad faith and for a malicious purpose," which would negate the privilege pursuant to Fla. Stat. 768.28(9)(a). (Doc. 55 at 2). However, despite making this argument, the Plaintiffs never present any such evidence. As such, the Defendants are entitled to summary judgment on the wrongful death claim.

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc. 35) filed by Defendant Michael Weippert is **GRANTED**. And it is further

**ORDERED** that the Motion for Summary Judgment (Doc. 36) filed by Defendant Donald F. Eslinger is **GRANTED.** The Clerk is directed to enter judgment for the Defendants and close the case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 5, 2009.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE